J. C. MOREE v. THE STATE.

No. 22924. Delivered November 1, 1944.

The opinion states the case.

*J. O. Ward,* of Borger, and *Sturgeon & Sturgeon,* of Pampa, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

Murder is the offense; the punishment, twenty years in the penitentiary.

The Scott Apartments in Borger, Texas, operated by H. F. Troth, consisted of a series of one and two-room apartments housed in two separate one-story buildings—a south building and a north building. A concrete walkway about six feet in width separated the two buildings.

On the afternoon of January 6, 1944, the deceased, Jeff Williams, rented and was assigned to Apartment No. 27 in the south building. Appellant and his wife, at that time and for some time prior, occupied Apartment No. 8 in the north building. About 9:30 o'clock on the night of January 7, 1944, appellant was seen to go into the apartment of deceased. The witness Posten, who occupied the apartment adjoining that of deceased, testified that about 10:00 o'clock on the night of January 7, 1944, he heard a man and a woman in deceased's apartment with him; that a fight started and he heard "one voice say, one man say to the other, 'You asked for it * * *. Get up from there.' and plumb hit the floor and went to telling him, 'Get up from there', and the woman says 'Get up from there', and it wasn't long until he got up and there was another rumble." The witness testified further that he heard one of the men groaning.

On the morning of January 8, 1944, the day following the above incident, Troth went to deceased's apartment and knocked on the door. He received no response. Later, about 2:00 o'clock, p. m., he again knocked on the door, with no response. About 6:00 o'clock, p. m., he knocked on the door and, receiving no response, entered and found deceased lying on the bed. "His left eye was closed and just as black as it could be and blood seeping out of his eyes. He * * * couldn't be still and he was holding his left eye." The blood was all over the floor, the bed, and the deceased. Troth said that when he first saw deceased, upon entering the room, he thought he was dead but as "I stepped in on the floor he turned his head up where he could see me, and I said, 'What is the matter here?' and he said, 'I have been hijacked and robbed and nearly beat to death. They have taken my money and even taken a carton of cigarettes.'" Upon being asked, "Who done it?" deceased replied, "The people in No. 8." Troth testified further that deceased, in that conversation, told him, "Well, he said, after what I told you he said, he said that he knocked him out, and he lay there on the bed and said he wasn't knocked out, he wasn't clear out but he was laying there

on the bed and said he couldn't do anything. He knew he couldn't do anything, and he was watching out of his right eye, and he said they just acted like two—he wasn't completely out, and he lay there on the bed, knew that he couldn't do nothing about it, and was watching out of his right eye while he was laying there on the bed, and he said they acted like two rats in going through everything there was in the room, looking for something else." Immediately following this conversation, Troth notified the sheriff, who later arrested appellant and his wife and carried them before the deceased. Upon being asked by the sheriff if he knew them, deceased replied, while pointing his finger at them, "That is them, that is both of the dirty son-of-bitches."

Deceased was carried to a hospital where his wounds were dressed and first aid administered, after which he returned to his apartment. Two days thereafter, he died, the cause of his death being a brain concussion in the region of the left eye, with probably a basal fracture inflicted during the difficulty.

Appellant did not testify, nor did he offer any defensive testimony.

The indictment alleged that the murder was committed "by some means, instrument, and weapon, to the grand jury unknown." There was no direct testimony to what efforts the grand jury used or made to ascertain the character of the instrument or weapon with which the murder was committed. Appellant insists that the absence of such testimony renders the evidence insufficient to support the conviction. Ordinarily, the rule is as contended by appellant but an exception to the application thereof exists when the facts show that no one knew, or could have known by the exercise of reasonable diligence, the instrument, or nature thereof, used in committing the murder. In such cases, the averment in the indictment that the deceased came to his death by an unknown instrument is sustained. The facts bring the instant case within the exception mentioned, especially when, in addition to the other facts in evidence, a search of the room failed to reveal any weapon or instrument with which it could reasonably be said the murder was committed. Harris v. State, 37 Tex. Cr. R. 441; 36 S. W. 88; Bookman v. State, 112 Tex. Cr. R. 233; 16 S. W. (2d) 123; McNiel v. State, 131 Tex. Cr. R. 553; 100 S. W. (2d) 365.

Complaint is made of the receipt in evidence of the testimony of the witness Troth that deceased told him that it was

"the people in No. 8" who had beaten and robbed him, the objection being that such testimony was hearsay. The trial court entertained the view and admitted the testimony upon the theory that it was res gestae and, therefore, admissible as an exception to the hearsay rule. It is insisted by the State that this testimony was a part of the res gestae under the rule that, when a condition of suffering exists from the infliction of the injury to the making of the statement in a given case, it might extend far enough to preclude premeditation and not thereby limited to any specific time. Nami v. State, 263 S. W. 595.

As we have often said, the test as to whether a statement is or is not a part of the res gestae is to be determined, primarily, upon the facts of each case and must be spontaneous, so as to preclude premeditation or narration of past events. Spontaneity is a controlling factor.

Time—that is, time between the happening of the event and the making of the statement—has not been deemed alone controlling. The time element, however, must be given consideration. Analyzing the instant facts in the light of the rule stated, we find that the length of time intervening between the infliction of the injury to the deceased and the making of the statement was something like sixteen or eighteen hours; the statement was made in reply to questions propounded; the deceased had suffered severe and painful head injuries, from which he later died. Whether deceased was rendered unconscious by the injuries or how long he remained in such condition, the record does not affirmatively reflect. Troth's testimony does not indicate that deceased was unconscious at the time he approached him and propounded the question as to "What is the matter here?" for deceased immediately replied thereto. What deceased had done or where he had been during the intervening time, the record does not disclose. His injuries were not such, at the time, as to preclude the idea that he was unable to leave the premises, for he did thereafter go to the hospital for first aid, after which he returned to his apartment. The record does not negative contact or conversation with others during the intervening time.

As to these suggestions, the State calls attention to the fact that Troth knocked on the door of the apartment twice before he finally entered, without receiving any response from the deceased, as showing that deceased was unconscious at that time. Such fact would be pertinent provided deceased was in the apartment at the time.

It must be remembered that, in cases of this character where hearsay testimony is sought to be used against an accused and identifying him as the guilty party, the burden is upon the State to show that such testimony falls within an exception which authorizes the introduction of such testimony. Unless, then, the testimony is shown to fall within the exception, its admissibility has not been established.

In the light of all the facts here presented, we are constrained to hold that the State has not met that burden or shown that the testimony came within the rule of res gestae. In support of this conclusion, we call attention to the following: Trammel v. State, 167 S. W. (2d) 171; Wallace v. State, 200 S. W. 407; Allen v. State, 65 S. W. (2d) 311; 18 Tex. Jur., p. 322, Sec. 198.

Appellant complains of the receipt in evidence of the testimony to the effect that the deceased identified the appellant and wife as his assailants when they were brought before him by the sheriff, the objection being that it was hearsay. Note is taken of the fact that the appellant and his wife were under arrest at the time; that the witnesses were detailing what was said by the deceased in their presence.

The trial court entertained the view, as shown by the qualification to the bill of exception, that the testimony was admissible on the theory that it was a conversation which took place in the immediate presence and hearing of the defendant and was such an accusation as called for a reply on his part. Ordinarily, the rule is that when a statement is made in the presence of an accused which he understands, and it calls for a reply on his part, his silence or acquiescence may be shown as a confession. An exception to the rule is that it has no application when the accused is under arrest, for, under such circumstances, he is under no burden of replying. Branch's P. C., Sec. 64; Simmons v. State, 50 Tex. Cr. R. 527, 97 S. W. 1052; Jackson v. State, 58 S. W. (2d) 1014; 18 Tex. Jur., p. 149, Sec. 75.

The statement objected to, not coming within the exception stated, was inadmissible.

When the grand jury was about to be impaneled following the commission of the alleged offense, appellant's counsel appeared and challenged the array of grand jurors because they had not been summoned in the manner as required by Art. 345, C. C. P., as amended by Chap. 312, Acts of the Forty-eighth Legislature, in 1943, in that the grand jurors had not been sum-

moned personally or by leaving a written notice, as provided therein. Upon such challenge being made and it appearing that the grand jurors had not been so summoned, but, to the contrary, had been summoned by mail, the trial judge deferred for a week the impaneling of the grand jury, during which time the sheriff did summon the grand jurors, as provided by law. The trial court then overruled the challenge to the array and, from the list of the grand jurors so summoned, impaneled the grand jury, which returned the indictment in this case. Appellant insisted, by motion to quash the indictment, that his challenge to the array should have been sustained and that the grand jury had not been summoned as required by law and was, therefore, an illegal grand jury.

The record affirmatively reflects that the grand jury so impaneled was obtained from a list of grand jurors drawn by a jury commission and summoned, as pointed out. This was in substantial compliance with law. It must be remembered that the purpose and intent of the Legislature in the enactment of Chapter 312, Acts of the Regular Session, Forty-eight Legislature, and appearing as Articles 333, 344 to 346, inclusive, of Vernon's Code of Criminal Procedure, was to provide for the selection of grand jurors by a jury commission. This right the appellant was accorded in the instant case. Moreover, there is an entire absence of any injury to the appellant, because the grand jury that was impaneled was from a list selected and drawn by the jury commission. Appellant's challenge to the array, as also his motion to quash the indictment, was properly overruled. Walker v. State, 283 S. W. 787; Hill v. State, 114 S. W. (2d) 1180.

An exception was reserved to the failure of the trial court to submit the issue of aggravated assault. The rule now appears to be that aggravated assault is deemed to be raised in a murder case when the instrument with which the murder is inflicted is not a deadly weapon, per se, or one which, in the manner of its use, is not ordinarily calculated to produce death, and when, in addition thereto, the evidence raises the issue of a lack of intent to kill. Barnett v. State, 162 S. W. (2d) 411-416; Thompson v. State, 162 S. W. (2d) 728, and authorities there cited.

In the instant case, we do not know the nature or character of the instrument used; whether it was or was not a deadly weapon, per se, or one calculated to produce death or serious injury in the mode or manner of its use. We only know that deceased came to his death as a result of injuries inflicted to

his head. The witness Posten, by his testimony, suggests that the injuries were inflicted during a fight, which—if believed—would raise the issue of a lack of intent to kill. It appears, therefore, that under the facts here presented, a charge on aggravated assault was called for.

For the errors pointed out, the judgment is reversed and the cause is remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.